IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JOAN MCCRELESS, } | |
| } | |
| Plaintiff, } | |
| } | CIVIL ACTION NO. |
| v. } | 05-AR-1964-S |
| } | |
| GLOBAL UPHOLSTERY CO., INC., } | |
| et al., } | |
| } | |
| Defendants. } | |

**<u>MEMORANDUM OPINION</u>**

The court has for consideration the motion of defendants, Global Upholstery Co., Inc. ("Global") and Ram Machines (1990) Ltd. ("Ram") (together, "defendants"), to exclude the report and testimony of Raymond Thompson, Ph.D., P.E. ("Thompson"), who is the expert witness proffered by plaintiff, Joan McCreless ("McCreless"), in the above-entitled products-liability case. Also before the court is the motion of defendants for summary judgment. Defendants contend that Thompson's opinion testimony does not qualify as the relevant scientific knowledge required by Federal Rule of Evidence 702, and because it must be excluded, McCreless cannot proceed. The question is whether there is a sound scientific basis for Thompson's conclusion that there is a causal connection between an allegedly defective chair and the injury sustained by McCreless when she used the chair.

This court respects Thompson's credentials. He is entirely qualified to speak on the subject at hand up to a point, but not on

the ultimate question of liability, as he purports to do in his report.  In discharging the difficult obligation pointedly laid upon this court by the Eleventh Circuit in *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233 (11th Cir. 2005), wherein the Eleventh Circuit expressed shock at this court's inability to perform its *Daubert* gatekeeper role in a case involving elaborate expert opinions by credentialed witnesses on a highly technical subject, the court concludes that the methods and procedures used by Thompson are not sufficiently reliable to meet the Rule 702 standard.  Despite residual misgivings about its own competence to judge the opinion of another on a scientific matter under analysis, the court, bolstered by the thought that no subject is so complicated as to be above the head of the gatekeeper, and after agonizing over the unfamiliar scientific principles that must be employed here, decides that Thompson's opinion does not pass *Daubert* muster.  As a result, defendants' motions to exclude and for summary judgment will be granted.  If a reader wants to see how reluctantly this court is abandoning its pre-*Daubert* reticence to interpose itself between the jury and a witness who proffers an expert opinion, the court invites a perusal of this court's opinion in *Sutherland v. Matrixx Initiatives*, Civil Action No. 04-AR-0129-M (N.D. Ala.), Mem. Op. dated Nov. 7, 2006.

**Facts**

The basic facts of this case are simple, straightforward, and

undisputed. On September 19, 2003, while at work as a property clerk for the Birmingham Police Department, McCreless attempted to sit in a one-year-old chair that was manufactured by Global and that contained components manufactured by Ram. McCreless had sat in the chair without incident numerous times during the previous year, but on this particular occasion the chair seat rapidly dropped and tilted forward. This action caused her to be thrown from the chair, whereupon she sustained painful back injuries when her body twisted and the chair rolled backward behind her. Since her fall McCreless has undergone four operations on her back, including a spinal fusion. Inspection of the chair after the accident revealed that some of the chair's components were unserviceable or broken. In Thompson's expert report, he says that the pneumatic piston used to raise and lower the seat was not working properly, and that a bracket attaching the pneumatic piston to the seat was fractured. The report contains no finding as to the age of the fracture, or when the pneumatic piston first malfunctioned, or the degree of wear and tear on the chair. There is no evidence to suggest that a Global chair like this model has ever before malfunctioned in a way to cause personal injury.

McCreless filed her complaint on September 19, 2005, asserting claims against Global under theories of negligent and wanton conduct, failure to warn, breach of contract, breach of warranty, and the Alabama Extended Manufacturer's Liability Doctrine

3

("AEMLD"). She amended her complaint to add Ram and Leggett & Platt Canada Corporation, d/b/a Northfield Metal Products ("Northfield"), as defendants, but the action as to Northfield was dismissed upon plaintiff's motion, leaving as the only defendants the two who now move for summary judgment.

### Defendants' *Daubert* Motion

**I. Legal Standard**

Defendants contend that Thompson's testimony must be excluded because it would not assist the trier of fact and because Thompson failed to base his conclusions on the proper scientific methods required by Federal Rule of Evidence 702.[1] As the proponent of this testimony, McCreless bears the burden of establishing its admissibility. *United States v. Williams,* 95 F.3d 723, 729 (8th Cir. 1996), *cert. denied* 519 U.S. 1082, 117 S. Ct. 750 (1997).

Rule 702 is designed to ensure both that expert evidence has an adequate factual basis and that it meets a minimum standard of reliability. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), the Supreme Court made abundantly clear that Rule 702 is concerned both with the reliability and with

---

[1] Rule 702, Fed. R. Evid. states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

the relevancy of expert scientific evidence.  It demands a rigorous examination of expert opinion before a jury is allowed to hear it.  In *Daubert* and its progeny, the Supreme Court has established a test for deciding this question of admissibility.  Under *Daubert*, the trial court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  *Id.* at 592.  In other words, the trial court, acting as "gatekeeper," must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts at issue."  *Id.*

In order to satisfy its *Daubert* obligation, enforced and reenforced on this court by the Eleventh Circuit in *McClain*, this court must "engage in a rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated by *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005) (internal quotations and citations omitted).  It is the reliability of Thompson's

opinion that is primarily at issue here, although all three of the above listed inquiries are to some degree implicated.

To evaluate the reliability of Thompson's proffered testimony, the methods, procedures, and reasoning he used in reaching his ultimate opinions must be evaluated.  As the Supreme Court held in *Kumho Tire Co., Ltd. v. Carmichael*, the trial court must ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."   526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999).  It is not the role of the court simply to agree or disagree with an expert's final conclusions.  "Rather, [it is] only to determine whether the principles and methodology underlying the testimony are valid," or, in other words, to see if how he got to where he ended up makes reasoned, scientific sense. *United States v. Bonds*, 12 F.3d 540, 556 (6th Cir. 1993).  If the methodology is scientifically sound, the conclusions are deemed scientifically valid.[2]    The focus of the court, then, is "on how experts reach their conclusions and not on the conclusions themselves."  BERT BLACK & PATRICK LEE, EXPERT EVIDENCE: A PRACTITIONER'S GUIDE TO LAW, SCIENCE, AND THE FJC MANUAL, 21 (West Group, 1991).

In *Daubert*, the Supreme Court pointed to several non-exclusive

---

[2] Scientifically valid evidence does not necessarily reflect the ultimate truth.  The ultimate veracity of evidence is to be determined at trial.  Two experts can disagree and yet both be allowed to testify if they both pass the *Daubert* test.

factors to guide the trial court's reliability analysis, including: (1) whether the expert's theory has been subjected to scientific testing; (2) whether the expert's opinions and research has been reviewed by academic peers; (3) the rate of error and controls standards; and (4) the general scientific acceptance of the technique or theory. *Daubert*, 509 U.S. at 593-94. These factors are not the only ones that can be considered, but these, at least, should be considered. *See Id.* at 593.

Reliability alone is not enough. In order for expert evidence to be admissible, it must also be relevant. Under the *Daubert* regime, the trial court must determine that the proffered testimony is sufficiently related to the issues in the particular case so that it will assist rather than confuse the trier of fact in resolving the dispute, in this case, the ultimate questions leading to liability under plaintiff's theories. *Id.* at 591.

## II. *Daubert* Analysis

To briefly review, evidence is admissible under Rule 702 if it (1) is offered by a qualified expert; (2) is the product of reliable scientific methods; and (3) is relevant and of assistance to the trier of fact. This court's *Daubert* analysis begins with a clarification of what is **not** at issue in this case. First, Thompson is unquestionably qualified and competent to testify about matters related to the science, engineering, and testing of solid materials. This was also true of the two highly credentialed

witnesses this court erroneously allowed to testify in *McClain*. Thompson's professional record provides ample basis for finding that he is an expert in the broad subject of materials failure analysis. Therefore, this court easily finds that the first part of the three-part test is satisfied. Thompson is not, however, a mechanical engineer or an expert in force dynamics, and his opinions on matters related to these fields do not pass the scrutiny required by *Daubert*. Thompson's testimony regarding causation and alternative designs also satisfies the third part of the test. His testimony in this regard is undoubtedly relevant, because it would be of assistance to the jury and is, in fact, indispensable to a jury verdict in favor of McCreless. It passes the third part of the *Daubert* test. However, after an analysis of the methods and procedures Thompson employed to reach his conclusions, the court finds that they are not, as a whole, sufficiently reliable to pass muster under *Daubert*. Because Thompson reached his causation and alternative-design conclusions via inadequate methods and techniques, his opinion that the chair bracket was defective and caused the injury cannot be presented to the jury.

In his Rule 26(a)(2) report, Thompson concludes that "[t]he chair was found to have a severe fracture of the bracket that attached the seat to the chair base. The failure of this bracket would have caused the accident to McCreless . . . ." Having

conducted no analysis beyond making a visual assessment of the chair's post-break components and taking measurements of the broken parts and the fall rate of the unserviceable piston, Thompson offers three separate opinions on causation. The admissibility of these opinions will be addressed in succession.

> **A.  The failure of the seat bracket caused the seat to tilt down and drop.  This movement would cause the chair to shoot backwards as the seat fell downward**.
>
> The seat tilted approximately 11 degrees when the bracket broke.  An 11 degree tilt would cause 20% of the occupant's weight to push the seat backwards.  For a 180 pound person, this is equivalent to pushing the chair backwards with a force of 37 pounds.  Since the chair is on casters/wheels, a 36 pound force causes the chair to shoot backwards.  This was evident during the inspection of the chair when a foot had to be put against the caster to prevent it from sliding backward when someone sat in the chair to measure the pneumatic piston fall rate.

This proposed testimony cannot be allowed into evidence because it would not assist the trier of fact and because Thompson is not qualified to give a critical portion of the said opinion.  There is no dispute that the bracket attaching the piston to the seat of the chair in which McCreless attempted to sit was, in fact, fractured. But the mere fact that the bracket was broken, without any evidence as to when it broke or what actually **caused** it to break, cannot provide a basis for establishing liability on the part of defendants or either of them.  *See Emody v. Medtronic, Inc.*, 238 F. Supp. 2d 1291, 1295 (N.D. Ala. 2002) ("An essential element of all product liability cases is expert testimony, passing *Daubert* muster, that a defect was the medical cause of plaintiff's claimed

injuries") (citing *Tidwell v. Upjohn Co.*, 626 So.2d 1297, 1299 (Ala. 1993)). The court will hereinafter discuss the methods and procedures Thompson used to arrive at his opinion that the failure was caused by a poor manufacturing method and why it does not meet the level of reliability required to meet the *Daubert* admissibility standards. *See infra* pp. 10-12.

Second, if the court assumes the relevance of Thompson's testimony that the failure of the bracket caused the seat to tilt and drop, causing the chair to shoot backwards as the seat fell downward (something which the court cannot assume, for the reasons discussed in the preceding paragraph), Thompson is not qualified to offer this opinion. *See Rink*, 400 F.3d at 1291. As conceded, Thompson has an impressive educational and professional record, but his credentials relate to materials engineering, failure analysis, materials specifications, materials analysis, and materials testing. Plaintiff has not demonstrated to this court's satisfaction how Thompson's expertise in materials science qualifies him to express an opinion regarding force dynamics, classical mechanics, or mechanical engineering. This is particularly true when the analysis is purely theoretical, without any like incidents to compare with this one or to suggest anything but a metallurgical aberration traceable, if at all, to an unknown steel manufacturer. This is not like a Ford roll-over case, where the expert is able to look at, analyze, and compare dozens of

rollovers.  Here, the absence of like failures among hundreds, if not thousands, of chairs like this one increases the strenuousness with which the expert's conclusions as to this particular chair must be examined.  For these reasons, any of which would be sufficient standing alone, Thompson's first proposed opinion must be excluded.

> **B.  A main cause of the seat bracket failure was the poor manufacture method used for making the bracket.  A crease/seam was pressed into the bracket which weakened the bracket and allowed cracks to form in the crease/seam.  The cracks formed in the crease/seam and followed the seam/crease around the center hub.**
>
> Ample evidence was found, as discussed in the section on seat bracket failure, to tie the facture [sic] of the bracket to the manufacture method.  The bracket was made by a stamping process.  This is where a piece of sheet metal is put into a press that contains a die or series of dies that cut and shape the piece of sheet metal into the desired shape.  The same equipment is used to punch holes in the sheet as used to push a shape such as the dome to which the pneumatic piston connects.  One difference between the punch to make a hole and the die to push up the dome is the shape and edges of the die pieces.  It appears that one side of the die had an edge which was too sharp and damaged the metal.

Thompson's second opinion must also be excluded because, as the court has previously indicated, the methods and procedures used to reach this conclusion were not sufficiently reliable.  The "section on bracket failure," which Thompson incorporates by reference in his second opinion, states in its entirety:

> The seat bracket shown in picture 027 was broken in such a way to allow the seat to tilt forward as seen in picture 045.  The bracket as seen in pictures 076 and 087 was torn downward at the front edge of the seat bracket.

> The bracket was manufactured by a stamping process using a sheet metal steel. The stamping process that was used raised a dome at the center where the pneumatic piston release button is located. This part of the stamping was done at the center where the pneumatic piston release button is located. This part of the stamping was done in such a way as to produce a crease/seam in the metal seen in picture 085. The crease/seam was a location of weakness which allowed cracks to form in the crease as seen in picture 089. It is evident from pictures like 084, 087 and 089 that the crease/seam in the stamping was a significant contributing factor in the failure of the bracket.

As Thompson's report clearly admits, the procedure he followed in reaching his second opinion consisted of nothing more than visual analyses and physical measurements of the broken seat components. He never applied force to the crease/seam on an identical chair to test its breaking point. The court reiterates the non-exhaustive set of guidelines that district courts must use when determining whether an expert's methods are reliable: (1) whether the theory or technique can and has been tested; (2) whether the theory or technique has been subjected to peer review in publications; (3) the known or potential rate of error of the theory or technique; and (4) whether the theory or technique is generally accepted as reliable by the relevant scientific community. *Daubert*, 509 U.S. at 593-94. Here, for one thing, Thompson makes no attempt to factor in wear and tear. He did not test or attempt to test his theory that the stamping process used by Global or Ram created a seam/crease to form in the bracket, which in turn caused the bracket to break. Of particular significance is the fact that he

did not stage any experiments whatsoever.  *See id.* at 593 ("Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested"). He did not physically compare a chair that incorporates the Global or Ram stamping-process bracket to any alternative design.  Instead he merely suggested alternatives that, to him, are hypothetically more feasible or desirable.  This is not the stuff which gets by *Daubert*.

Thompson explains that "it **appears** that one side of the die had an edge which was too sharp," but he did not compare the actual die that was used to fabricate the bracket used in the chair at issue to a different die used in the same or a similar process (emphasis added).  He did not compare two brackets made using different shapes or types of die.  For aught appearing, Thompson never even looked at or attempted to look at the actual die that he says caused a manufacturing defect in the failed bracket.  His approach has not been subjected to the review of any of his peers. As the proponent of the proposed testimony, McCreless bears the burden of showing that Thompson's investigative techniques are reliable.  *Williams,* 95 F.3d at 729.  McCreless points to no scientific literature to suggest that sole reliance on post-failure measurements and visual inspection is generally accepted as reliable by the relevant scientific community.  The one and one-

13

half page document issued by the American Society for Testing Materials titled STANDARD PRACTICE FOR REPORTING OPINIONS OF SCIENTIFIC OR TECHNICAL EXPERTS, and cited by McCreless, deals with what should be the general contents of a scientific or technical report used in communicating an expert opinion.  It provides that "[t]he report shall contain the logic and reasoning of the expert by which each of the opinions and conclusions were reached," but it does not address specific accepted methods or reasoning that must be used in reaching the opinions and conclusions.  The record is devoid of evidence that Thompson's technique has been subjected to peer review in publications or otherwise.  In short, Thompson's methodology falls far short of meeting the threshold of reliability established by *Daubert*.  His second opinion must therefore be excluded.

> **C.  Several alternative designs would have prevented the failure of the bracket and the ensuing accident.  These are in order of preference: 1. eliminate the design of the stamped dome shape and use a box with a center hole design, 2. use a die design that does not thin, stretch, or crease the metal at the junction of the pneumatic piston to the seat, 3. increase the thickness of the bracket sheet metal so that it can carry more stress.**
>
> Alternative designs are available that increase the strength of the broken joint significantly.  The first alternative is to use a box with a hole.  The pneumatic piston comes up through the hole and attaches at the top of the box.  One problem with the dome design used in the broken chair is that when a person sits in the seat the bracket gets heavily loaded at the front edge of the dome causing it to crack.  The box design distributes the load more evenly along the edges of the box and through the top of the pneumatic piston.  This design is used on many

> drafting and lab chairs.  The second alternative would
> remove the defect in the stamped bracket and thus
> strengthen it.  The third alternative is to use a thicker
> piece of steel for the bracket.  The increased thickness
> will offset strength lost to defects in the stamping
> process.  If the stamping is done properly the increased
> thickness will help offset the design drawbacks of the
> dome shaped connection between the pneumatic piston and
> the seat.

Thompson's opinions regarding alternative designs may very well be correct, as may be his other alternate opinions.  Under *Daubert*, however, this court does not itself simply agree with or disagree with Thompson's conclusions.  It instead focuses on the methods Thompson used to reach his conclusions.  *Bonds*, 12 F.3d at 556.  The problem with the methods and procedures behind Thompson's third set of opinions is that, as far as the court can detect, there were no methods or procedures employed.  Thompson did not conduct any experiments to test the load-bearing capabilities of the alternative designs he proposes.  He does not testify that a chair incorporating either of his latter two proposed designs has ever been tested or even created by anyone, much less by him.  While he states that the first proposed alternative is "used on many drafting and lab chairs," he has not tested the strength of such a design in comparison to the design used in the Global chair.  Nor has he presented any models of his alternative designs.  McCreless responds to defendants' *Daubert* motion as to alternative designs by contending that testing these designs was unnecessary because Thompson "spent 24 years of his 33 professional years doing

15

technical and scientific research while teaching courses for over 18 years in Mechanical Failure and Mechanics of Failure." Under the *Daubert* regime, in a products-liability case, "intuition," "common sense," and "general experience" in a particular field are not acceptable methods for reaching sound scientific conclusions. This was the lesson this court learned in *McClain*.

*Senn v. Carolina Eastern, Inc.*, 111 F. Supp. 2d 1218 (M.D. Ala. 2000), a case that was affirmed by the Eleventh Circuit without opinion and upon which McCreless relies for the proposition that a court may defer to an expert's credentials and experience when conducting a *Daubert* analysis, is inapposite. *Senn* was a case brought by farmers against a fertilizer manufacturer. The farmers' peanut crops were damaged after being treated with fertilizer manufactured by the defendant company. Because *Senn* was not a products-liability suit like *McClain* was, the expert was not required to show that the fertilizer was unreasonably dangerous as a result of a defect and that the plaintiffs suffered injuries as a result of such defect. In *McClain*, the Eleventh Circuit made it clear that in a products-liability case, a testifying expert cannot pass *Daubert* by resting on his laurels. Thompson's opinions regarding alternative designs must be excluded.

### Defendants' Motion for Summary Judgment

McCreless relies on the tort theories of the AEMLD,

negligence, and wantonness.[3]  In *Brooks v. Colonial Chevrolet-Buick, Inc.*, the Alabama Supreme Court explained:

> We recognize that *Sears, Roebuck & Co. v. Haven Hills Farm, Inc.*, supra [395 So.2d 991 (Ala.1981)], does not stand for the proposition that expert testimony is *always* required in such cases; however, it does stand for the proposition that because of the complex and technical nature of the product and in order to present evidence from which a lay jury may reasonably infer that a defective condition of the product was the cause of the product's failure and the cause of the resultant injury to the plaintiff, expert testimony is *usually* essential and, therefore, usually required. If, however, under all the attendant circumstances, absent expert testimony, the jury could reasonably infer from the product's failure of performance that a defective condition caused the injury, a prima facie case has nonetheless been established. *Sears, Roebuck & Co. v. Haven Hills Farm, Inc.*, supra.

579 So.2d 1328, 1332 (Ala. 1991) (emphasis in original). There is no reason to find that this case merits an exception to the general rule that expert testimony is essential to the establishment of a defective condition in a product like a chair. Although the piston-and-bracket design of the Global chair may be less complicated than the automobile-brake mechanism that was at issue in *Brooks*, McCreless agrees that her theory of causation depends on the scientific and/or engineering opinions that Thomson tenders. Without Thompson's testimony, and considering all attendant circumstances, there is no evidence under which a theory of *res ipsa loquitur* emerges, or upon which a jury could reasonably infer

---

[3] McCreless's complaint also lodges additional claims under theories of failure to warn, breach of contract, and breach of warranty. McCreless does not dispute that defendants are entitled to summary judgment on these additional claims.

from the chair's failure that it was defective in a way that caused McCreless's injury.  Because defective design or manufacture and proximate cause are essential elements of all theories being pursued by McCreless, and because without Thompson McCreless has no evidence to support these essential elements, defendants' motion for summary judgment must be granted.  This renders moot the other contentions in defendants' motion for summary judgment, some of which are not lacking in merit.

### Conclusion

Under *Daubert*, even the most distinguished scientist or engineer must strictly adhere to the rigors of the scientific method.  And the trial court, no matter how esoteric or difficult the subject, must understand it sufficiently well to dissect and critique an expert's proffered opinion.  *Daubert* endows the trial court with that obligation, and ostensibly with the wisdom to discharge it.  The trial court does not have to find an expert to be a charlatan or a fool to keep the gate shut on him.  The trial court opens the gate only if the scientific method has been totally complied with.  If Thompson's proffered expert opinion is infected with faulty or unreliable methodology, even if otherwise plausible, it must be excluded.  After applying *Daubert* principles to Thompson's opinions, the court reaches the conclusion that his testimony is methodologically unsound, is subject to too many scientific shortcomings, and must therefore be excluded.

By separate order, the court will grant defendants' motion to exclude Thompson's testimony.  Because this ruling will leave McCreless with no evidence to prove that her injuries were caused by any tortious act or omission of either defendant, defendants' motion for summary judgment will also be granted.  The court will also grant defendants' motion to strike Thompson's supplemental report under Rule 37(c), Fed. R. Civ. P., because McCreless did not tender that report in a timely manner in accordance with Rule 26(a)(2) and the scheduling order entered in this case.

DONE this 13th day of July, 2007.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE